## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BENARD MCKINLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Case No. 3:14-CV-01137-MAB** |
| ) | |
| JOSHUA   SCHOENBECK,   LANCE ) | |
| PHELPS, JACQUELINE LASHBROOK, ) | |
| MICHAEL   ATCHISON,   KIMBERLY ) | |
| BUTLER,  RICHARD  HARRINGTON, ) | |
| JARED     PHILLIPS,     CAMERON ) | |
| WATSON, AND ALEX JONES, ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM AND ORDER</u>

**BEATTY, Magistrate Judge:**

This matter is before the Court on the Motion for Summary Judgment filed by Plaintiff Benard McKinley ("Plaintiff") (Doc. 252). For the reasons explained below, the Motion is DENIED.

## <span style="font-variant:small-caps">Background</span>

Plaintiff is an inmate under the care of the Illinois Department of Corrections ("IDOC") who commenced several lawsuits throughout the past seven years, in which he alleged violations of his constitutional rights. *See McKinley v. Harrington*, SDIL Case No. 3:13-CV-00937-SCW ("*2013 McKinley*"); *McKinley v. Schoenbeck*, SDIL Case No. 3:14-CV-01137-MAB ("*2014 McKinley*"); and *McKinley v. Atchison*, SDIL Case No. 3:16-CV-0061-NJR-MAB ("*2016 McKinley*"). The procedural postures of these cases are convoluted but certain aspects are necessary to note.

Each of these cases involve(d) allegations that Plaintiff was denied adequate medical care for his asthma and/or subjected to unsanitary and cold living conditions. In October 2014, the Court severed three counts from *2013 McKinley* into this case, *2014 McKinley* (Doc. 46 of *2013 McKinley*). One of the severed counts alleges an Eighth Amendment conditions of confinement claim for Plaintiff's placement in a cold and dirty cell (Doc. 46 in *2014 McKinley*). The Court granted summary judgment on this count in favor of Defendants and Plaintiff appealed (Doc. 122 in *2014 McKinley*). Meanwhile, Plaintiff filed *2016 McKinley*, alleging another Eighth Amendment conditions of confinement claim (Doc. 20).

In December 2016, the remaining count in *2013 McKinley* settled (Doc. 109) and in May 2018, the Seventh Circuit reversed the judgment in favor of several defendants on the Eighth Amendment claim in *2014 McKinley* (Doc. 142); *McKinley v. Schoenbeck*, 731 Fed. App'x 511 (7th Cir. 2018).[1]

In November 2019, the Court consolidated *2016 McKinley* and *2014 McKinley* (Doc. 209 in *2014 McKinley*) and in May 2020, Plaintiff filed the operative amended consolidated complaint (Doc. 224 in *2014 McKinley*).

Plaintiff currently proceeds on the following counts:

**Count 1:**  Eighth Amendment conditions of confinement claim against Defendants Schoenbeck, Phelps, Lashbrook, Atchison, Butler, Harrington, Phillips, Watson, and Jones, for placing Plaintiff in a cell from October 2012 to October 2015 with a broken window, no heat or hot water, and rodent feces and urine on the cell, without giving Plaintiff cleaning supplies.

---

[1] The Seventh Circuit affirmed the judgment in favor of Chad Hasemeyer, who is not a defendant in the present action.

**Count 2:**   Eighth Amendment deliberate indifference claim against Defendants Schoenbeck, Phelps, and Creason for denying Plaintiff adequate medical care for his asthma, refusing to allow Plaintiff to clean or switch his cell, and placing Plaintiff in a dirty and cold cell, which exacerbated his asthma condition.

(Doc. 224).[2]

Plaintiff filed a Motion for Summary Judgment, arguing there is no genuine dispute that Defendants violated his Eighth Amendment rights (Doc. 252). Defendants oppose the Motion (Doc. 264).

### UNDISPUTED MATERIAL FACTS[3]

At all relevant times, Plaintiff was an inmate at Menard Correctional Center, Illinois ("Menard") (Doc. 254-1, p. 7, ¶21) (Doc. 254-1, p. 25, ¶21). Defendants are

---

[2] Defendants Cowan, Creason, Franklin, Kuder, Spiller, Hof, Reichert, and Lawrence were voluntarily dismissed from this action pursuant to stipulation (Doc. 249).

[3] To the extent a statement of fact is unsupported by the cited evidence, it is not considered as part of the summary judgment record. Specifically, Plaintiff's statement of fact number 67 states, "Defendant Watson testified he 'was aware that north two annex building had a hot water issue regarding inmates cells housed in administrative detention program.'" Plaintiff cites Exhibit 14, ¶ 9, which is a request for admission directed to Defendant Watson (Doc. 254-2, p. 202). However, Defendant Watson *denied* this request: "Defendant has no current recollection of hot water issues regarding inmates cells housed in administrative detention. As such, Defendant denies request #9" (*Id.*).

Plaintiff's statement of fact number 75 states, "On September 25, 2012, a work order was submitted for cell No. N2-C-01 for low water pressure, which was marked as completed on September 28, 2012, prior to Plaintiff's placement in this cell on October 25, 2015." Plaintiff cites Exhibit 28, which does not include a record for a September 25, 2012 work order (Doc. 254-4, p. 6-8).

Plaintiff's statement of fact number 106 states, "Defendant Watson admitted 'that during my time as chairperson of Menard C.C. Administrative detention program placement review committee I was aware of complaints of lack of heat in inmates' cells housed in north two annex building wings.'" Plaintiff cites Exhibit 14, ¶ 10, which is a request for admission directed to Defendant Watson (Doc. 254-2, p. 202). However, Defendant Watson *denied* this request: "Defendant has no current recollection of lack of heat in north Two Annex building wings. As such, Defendant denies request #9 [sic]" (*Id.*).

Plaintiff's statement of fact number 143 purports to quote a grievance that Plaintiff submitted on December 21, 2012. However, Plaintiff cites Exhibit 16, which does not contain the grievance.

personnel who worked at Menard in various capacities. On October 25, 2012, Defendant Michael Atchison placed Plaintiff in administrative detention following an Internal Affairs and Intelligence Office interview, during which Plaintiff stated he had no relevant information (Doc. 254-1, p. 7, ¶22) (Doc. 254-1, p. 24-25, ¶22). Defendant Joshua Schoenbeck placed Plaintiff in the North Two Segregation Unit, where Plaintiff remained until October 16, 2015 (*Id.*).

While Plaintiff was in administrative detention at Menard, Defendants Schoenbeck, Phelps, Lashbrook, Atchison, Butler, Harrington, Phillips, Watson, and Jones all served in an official capacity at Menard (Doc. 254-1, p. 4-7, ¶¶-4-20) (Doc. 254-1, p. 20-24, ¶¶4-20).

Defendant Atchison testified he "started at Menard in 1986 as an officer and worked through the ranks until 2000" (Doc. 254-1, p. 44). Defendant Atchison was the Warden of Menard "from December 1st, 2011, until late in January of 2013" (*Id.*).

Defendant Harrington testified he served as "assistant warden of operations till 2013 [a]nd then from 2013 to 2014, [he] was a warden" (Doc. 254-1, p. 83). In the spring of 2014, Defendant Butler became the warden, a position she held until 2016 (*Id.* at p. 102). Prior to this time, Defendant Butler served as the assistant warden of programs for three years (*Id.*).

Defendant Schoenbeck was a correctional officer assigned to the Intelligence Unit from September 2012 until December 31, 2014 (Doc. 254-1, p. 144, ¶ 20). Defendant Phelps was an Internal Affairs Officer at Menard between July 2012 and October 2015, during

which his duties included visiting the administrative detention area where Plaintiff was housed (Doc. 254-2, p. 157, ¶ 20).

Defendant Lashbrook admitted she was a correctional lieutenant assigned as a supervisor for Internal Affairs at Menard during 2012 until the end of February 2013 (Doc. 254-1, p. 162-63). Defendant Phillips was a correctional officer assigned to the North 2 Annex Building in C-Wing at Menard between October 2012 and October 2015 (Doc. 254-1, p. 5, ¶ 11) (Doc. 254-1, p. 22, ¶ 11) (Doc. 254-1, p. 170, ¶1).

Defendant Watson was the warden of operations and "was also part of the Menard Administrative Detention Program as a placement review committee chairperson between June 2014 and October 2015," during which he "read all written statements McKinley submitted to the Administrative Detention Placement Review Committee" and "toured north two annex building housing wings and spoke to inmates placed in administrative detention program" (Doc. 254-1, p. 200 & 202, ¶¶2-3 & 8).

Defendant Jones was the acting assistant warden of operations during the relevant period, during which his duties included supervising and coordinating the operations of the facility (Doc. 254-1, p. 6-7, ¶17) (Doc. 254-1, p. 23, ¶17) (Doc. 254-1, p. 206, ¶1).

Defendant Harrington described his day-to-day activities as "[l]ooking over emergency grievances, supervising the other assistant wardens, making tours of the facility" (Doc. 254-1, p. 84). During his tours, he would look to make sure "their physical well-being is fine, and then normally if they have any complaints or anything like that, they would voice them to me" (*Id.*).

Defendant Butler testified:

> [Y]ou oversee the facility and all the vendors and all the staff that work for you. There's a chain of command, you know, with department heads, and, you know, they answer to you. They deal directly with their individual departments, but then they inform the warden whenever things reach a level that need the guidance of the warden . . . So it's set up with the warden at the top of the organizational chart. And underneath the warden, there are two assistant wardens. And at one time, there was actually three assistant wardens . . . And then underneath them are department heads. So everyone is expected to work within their own department and be the expert of their own department. For example, healthcare would have a medical director that would deal with most of the medical issues. And then assistant warden of programs, you would be their supervisor. And then if there's an issue that would come up that would require the warden's attention, then it would be brought to the warden.

(Doc. 254-1, p. 102-03).

Examples of issues that require the warden's attention include "extreme violence or threat of violence" or if "there is an issue that requires the warden to sign off on a large expenditure" (Doc. 254-1, p. 103).

Defendant Butler testified that "anything that needed immediate attention, [office staff] would bring that to me. And that would normally be anything that involved violence or threats of violence or large expenditures" (Doc. 254-1, p. 103). Also, she testified that she "would go on tour in different cell houses once or twice a day" and "I'd just pop in to see if they were—see if everybody was doing what they were expected to do" (*Id.* at p. 111). "[E]verything is documented with the work order. So at the point the officer, lieutenant, or whoever became aware of an issue with the heating, windows, or water, they would have—should have put a work order in with the maintenance department" (*Id.* at p. 109). She testified that additional work orders would not be put in

if officers were aware that parts had been ordered because "[t]he work order would have initiated the ordering of the parts. The work order should have came first" (*Id.*).

On November 15, 2012, the Cumulative Counseling comments provide:

#1 grievance-claims his grievances are being maliciously mishandled, disregarded by staff which is impeding his ability to complete the grievance process. (NOTE-he dated this grievance 11/14/12) he claims that his privileges were taken from him as a general pop offender. He wants his privileges as a non-disciplinary statute inmate in general pop. Or released by to general pop. Response-you are on Admin. Detention status. You were given information on the Phase of Admin Detention when you 1st came to Admin Detention. Admin Detention is an administrative issue and not grievable. #2 grievance-same as #1. Dated 10/28/12-previously answered, will not revisit issue. NOTE-this counselor was on vacation for 2 weeks.

(Doc. 254-1, p. 217).

On December 7, 2012, the Cumulative Counseling summary comments include, "he wants me to contact his previous counselor and inquire about grievances" (*Id.*).

On January 18, 2013, the Cumulative Counseling Summary provides:

Responded to kite from offender on grievance status. Says GO is impeding his grievance process and denying his rights. Advised I have received 3 grievances and they are answered in the order received. Advised he has 60 days from the date of an issue, and as long as it is filed within that time frame he is ok. Advised if he does not agree with the facility decision, he has 30 days from the CAO signature to appeal to ARB.

#1 grievance-claims he has no rec'd any grievances back from the Grievance Officer. Claims that his grievance process is being impeded. Response-The Grievance Officer responds to grievances on a first rec'd, first answered basis. . .. #3- a duplicative grievance from past grievances on harassment & retaliation at the hands of Internal Affairs and intel officers. He wants this complaint to be documented in his file along with a request to be free of harassment. Response-this is a duplicate grievance, previously responded to & I will not revisit these issues.

(Doc. 254-1, p. 220).

Prior to his placement in administrative detention on July 25, 2012, the medical records show that Plaintiff's asthma—which he'd had since childhood—as well-controlled as he informed medical professionals that he only used his prescription inhaler once every 1-2 months (Doc. 254-1, p. 222). Accordingly, his inhaler prescription was discontinued as of October 24, 2012 (*Id.* at p. 224-25).

According to Defendant Butler, the administrative detention "was located in a building we call North II, in the newer part of it. We refer to it as the annex, and it was just a new add-on to the existing building. . .to accommodate the ADA offenders (Doc. 254-1, p. 104).

The administrative detention unit has two wings, the B Wing has seven cells, and the C Wing has eight cells (Doc. 254-1, p. 177).

Defendant Butler testified:

> Disciplinary segregation was separate than the administrative detention. So disciplinary segregation would require that an offender have a disciplinary report and have a finding of guilty associated with that report. Administrative detention was a place to separate offenders that were deemed potential threats or were real threats to the facility based on investigation.

(Doc. 254-1, p. 104).

On July 25, 2012, IDOC records indicate Plaintiff was placed in Cell No. N2-07-24 in the North 2 cell house segregation gallery where he remained until August 6, 2012 when he was briefly released back to the general population (Doc. 254-1, p. 229).

Thereafter, IDOC records show Plaintiff was placed in Cell No. N2-07-48 from August 25, 2012 through August 31, 2012 (Doc. 254-1, p. 229). Plaintiff was then moved

to Cell No. N2-04-11, where he remained from August 31, 2012 to September 26, 2012, when he was released back into the general population (*Id.*). On October 25, 2012, Plaintiff was again placed in administrative detention in Cell No. N2-C-01 where he remained until January 24, 2013. *Id.* On January 24, 2013, Plaintiff was moved to Cell No. N2-C-08 (*Id.*). Plaintiff was released from this level of administrative detention and moved out of Cell No. N2-C-08 on August 14, 2013 (*Id.*). At that time, Plaintiff was moved to Cell No. N2-C-06 where he remained until October 4, 2013 when he was moved to Cell No. N2-07-06 (*Id.*). On December 20, 2013, Plaintiff was placed in Cell No. N2-07-05 where he remained until April 17, 2014 before he was moved back to Cell No. N2-C-06 (*Id.*).

Defendant Butler described the provision of cleaning supplies on a regular basis as follows:

> [I]t was a weekly rotation of passing out things that were needed. Like, mops and disinfectant and things like that. The offenders—the other inmates that worked would be the ones that would pass that stuff out and officers would keep track of who was accepting it and who wasn't. But if someone asked for something and it wasn't necessarily that gallery's turn to get it, they would normally get it anyway.

(Doc. 254-1, p. 105).

Defendant Harrington testified "there was a cell house sanitation officer assigned to each cell house that would pass out cleaning materials" (Doc. 254-1, p. 85). "[T]heir primary duty is, yes, being the sanitation officer" (*Id.*).

The safety and sanitation officer in the administrative detention wing at the time of Plaintiff's incarceration was Thomas Mezo who would pass out cleaning supplies for inmates to use on weekends and on a few days throughout the week (Doc. 254-1, p. 183).

On the weekends, Mezo would pass out cleaning supplies, including half of a Scotch bright pad sponge, a cup of cleaning solution, a short-handled broom, dustpan, and short-handled mop to clean their cells (*Id.*). Mezo would stand there to supervise the inmates as they cleaned and took the supplies back from the inmates when they were done (*Id.*).

The chain of command for overseeing the provision of cleaning supplies was the gallery officer as the first person, and then the sergeant, then lieutenant of the cell house, and then the major (Doc. 254-1, p. 105). From there, the assistant warden of operations oversees all of the cell houses, which during her time as warden was Defendant Jones or Defendant Watson (*Id.* at p. 105 & 107). "[E]ach cell house did have a written schedule that was kept more in the staff area. So the staff would know who was supposed to have—what gallery was supposed to get the supplies (*Id.* at p. 105).

Officers were expected to keep notes including, "check[ing] off if someone—[received] cleaning supplies or someone refused to take a cleaning supply" in logbooks at their stations, including "logbooks for showers, logbooks for going to the yard, logbooks for cell searches. So they would keep track of all that and turn it in to the assistant warden of operations" (Doc. 254-7, p. 112).

On November 20, 2012, the comments on the Cumulative Counseling Summary provide:

> Another grievance on Admin Detention, claims there is no hot water, no cleaning supplies offered, claims he doesn't go to shower. Response—Admin Detention is an Administrative decision & not grievable. Per Lt. the hot water has been worked on. Cleaning supplies are offered on weekly

basis. If you choose not to shower, this is your choice, no one has forced
you.

(Doc. 254-1, p. 217).

On December 19, 2012, the Cumulative Counseling summary provides:

Grievance claiming that he hasn't been able to clean or sanitize his cell &
has had an asthma attack & now his inhaler is almost empty. He claims the
IA officers & mailroom are messing with his mail. Response—cleaning
materials are to be offered every weekend for offenders to use to clean their
cells. Due to the Christmas holidays the mailroom is swamped with holiday
mail I suggest that you follow proper procedure & submit a sick call request
concerning your medical issues & refills. Work orders have been submitted
on heat & water. NOTE—HCU ADMINISTRATOR NOTIFIED THAT
OFFENDER CLAIMS HIS ASTHMA INHALER IS EMPTY.

(Doc. 254-1, p. 217).

On January 9, 2013, the Cumulative counseling summary provides:

grievance dated as rec'd on 1/9/13. He alleges continuing problems from
1/3/2012 dealing with harassment & retaliation from IA. He alleges that he
was placed under investigation, had his job taken from him, he alleges that
he was asked to take a polygraph & repeatedly refused, he alleges he has
had to contend with unsanitary cell, lack of heat and hot water, mail being
maliciously handled, deprived of medication & placed in Admin Detention.
He alleges this started over 6 months ago, he wants this documented in his
master File. Response—The Administration has the right to conduct
investigations for the safety & security of the institution. Administrative
Detention is an Administrative placement and not grieveable. Previous
issues noted have been grieved, documented and responded to in a timely
manner.

(Doc. 254-1, p. 220).

On February 1, 2013, Plaintiff filed Grievance No. 104-2-13, where he stated:

I have complained of these conditions in past grievances and the following
problems have still not been handled. Since I have been in North 2
Administrative Detention I have not been able to use hot water in my cell,
I have no heat in my cell, and the season is still winter. I have not been able
to use weekly cleaning supplies to sanitize my cell, far as my toilet, sink, or

floor. Rodents have still been coming in and out of my cell at any given time. These unsanitary living conditions not only effect my present medical condition which is asthma, but also put me at risk of other infectious diseases from unsanitary toilets, sinks and floor. The fact that rodents are present give rise that they carry these infectious diseases that makes the risk even greater. General population or disciplinary segregation unit also in North 2 unit does not have to deal with the present problems that I have to, being that I am in a closed off extra security unit within Menard maximum security institution. These are not everyday problems that Menard Correctional Center puts all inmates they are housing which is general population. Disciplinary segregation unit and administrative detention unit only administrative detention unit is faced with these problems at hand. These deprivations have become a typical and significant hardship on me. I have never went through these problems until I was transferred to Menard Administrative detention unit whereas I've been in this present institution for nine years and never had to deal with these problems when I was in general population or times I was in Disciplinary Segregation unit at my stay in Menard Institution. I have filed past grievances on this matter when I first was transferred to Menard Administrative Detention unit which was over three months ago and these problems have still not change for the better. Being without heat in the cells. Hot water in your sink at your own convenience and sanitary supplies to clean your toilet, sink and floor for over three months and still counting is not everyday prison life problems. These problems have been going on for months, and if these problems ever effected the entire institution here at Menard they would have been fixed within the first couple weeks of notice. But since I am segregated in an extra security unit of Menard correctional center which is administrative detention and only make up about one percent of the population in the entire institution, my present deprivation I am suffering are not handled in a reasonable time frame as if I was in general population suffering the same deprivations. These problems are cruel and unusual punishment which present a typical and significant hardship on my living and personal health conditions. These problems should be fixed as soon as possible because it has been months and the problem is still present.

(Doc. 254-5, p. 307-08).

On February 4, 2013, the Cumulative Counseling summary provides:

grievance claiming that the heat doesn't' work, he has no hot water, he has no cleaning supplies available, rodents come in & out of his cell. response— the heat is on & it is very warm on C wing. Staff keep the wing very clean. Offenders are offered cleaning material on weekend. officers work to keep

hot water cycling to cells until a broken part can be replaced. mice have been found in property & currently exterminators are dealing with the issue

(Doc. 254-1, p. 231).

The Grievance Officer's Report for Grievance No. 104-2-13, dated February 21, 2013, provides:

Maintenance is aware of the hot water issue and was previously being worked on individually in each cell, but has since been bid out for an outside contractor for permanent repairs. In the meantime, Maintenance and the North Two Major have advised that there is hot water available. Staff turns on the showers periodically throughout the day to keep the hot water circulating and readily available. Prior to staff periodically turning the showers on, the hot water was working it just took longer for the hot water to reach the faucet in the cell on this wing (due to the distance the water has to travel in the pipes). The Major advised security checks are done weekly of each cell when showers are done, and the utilities are checked for plumbing, lighting issues, etc., in each cell. Also noted, the grievance is dated 2-1-13. On 2-5-13, Major Hasenmeyer advised maintenance went over the entire wing and thoroughly checked each cell for plumbing and lighting issues and any repairs needed were done.

The temperature is monitored daily and recorded. The entire cell house is walked by the Sergeant and a Lieutenant and has been noted as in the 70 degree mark. Cleaning supplies are passed out on the weekend under the supervision of an officer whether on lockdown or not. There is also a sanitation officer (Mezo) that makes routine rounds in the cell house. As far as rodents (mice), there has not been an issue noted with rodents on the Wing. The facility has routine preventative extermination services provided. Please advise staff anytime you observe an issue such as a mouse, so extermination services can be adjusted accordingly. **Your rodent concerns have been forwarded to appropriate staff (pest control). Pest control advised they have previously completed a preventative maintenance/extermination of the wings, but at the request of the Grievance Office, conducted another inspection and additional measures applied. Grievant may submit a request for sick call if he experiences any issues with asthma symptoms or other medical issues.

(Doc. 254-1, p. 233).

Defendant Phillips testified that there were mouse traps all over C wing (Doc. 254-1, p. 189).

On April 22, 2013, Plaintiff appealed the denial of Grievance No. 104-2-13 in a letter that included the following statements:

> I have not had no hot water in my cell for months. The shower was nothing to do with the water in my cell and the response to that complaint is not true. There has been no water coming through my cell that is hot, and this Institution knows that. I have had no hot water since October 2012, and when I did have some I was not in the housing unit that I have been put in now. Second, the Sanitation Officer has not given me no cleaning supplies to sanitize my cell. I have had no such supplies. All I get is one bar of bath soap and one roll of tissues a week. I have not been able to mop or sweep my room since I have been in this housing unit. I have had no cleaning supplies to sanitize my toilet or my sink. I have been subject to a germ infested living area since October 2012. Such sanitation officer has given me any cleaning supplies, and I have requested them several of times. That response the grievance officer gave is not true.
>
> This, Menard correctional center has not given the cell I reside in heat. The whole winter I was forced to be in a cell that had completely no heat at all. The response the grievance officer gave is totally untrue in nature. They know this cell of the wing I live on did not have any heat because it was broken.
>
> Fourth, the rodents run in and out of my cell every night. There has not been no body to come and fix that problem. The rodents has been coming in and out of my cell for months. This is a big problem that this Institution is aware of but has intentionally refused to fix the problem.
>
> The entire complaint I have given in my grievance has not been fixed. This institution know this, but is falsely saying they have. This is untrue in nature. So I am appealing this grievance to the next level.

(Doc. 254-1, p. 235-36).

Plaintiff's appeal regarding the denial of Grievance No. 104-2-13 was ultimately denied as having been appropriately addressed on January 6, 2014 (Doc. 254-1, p. 238).

The unit shift reports do not indicate that cleaning supplies were provided prior to or after any of the foregoing requests (Doc. 254-2) (Doc. 254-3). The unit shift reports do not indicate that an exterminator visited during this time frame (*Id.*).

According to Defendant Phillips, two days a week, inmates in the administrative detention unit are taken to shower one at a time by the shower crew (Doc. 254-1, p. 179-80). Defendant Butler testified that each cell house would also have a written schedule kept in the staff area for when each gallery was supposed to be taken to shower (Doc. 254-1, p. 105).

Defendant Harrington testified that "every now and again [the] hot water system would go down" (Doc. 254-1, p. 84). Defendant Atchison admitted he was aware of a hot water issue in North 2 Cell House for some period of time while he was the warden at Menard (Doc. 254-1, p. 76). Defendant Butler testified she received complaints from inmates directly that "the water wasn't hot enough" and that she was further alerted to the issue because it was a large expenditure that required her signature to get fixed (Doc. 254-1, p. 108). Defendant Jones stated, "there have periods of time where the hot water would not always work in the cells" (Doc. 254-1, p. 209). Defendant Phillips testified that he recalled Plaintiff complaining that the hot water did not work and there was no hot water in the cell or in the shower (Doc. 254-1, p. 186). He testified that the inmates, including Plaintiff, had to shower with cold water during the time the hot water was not working (*Id.* at p. 186-87).

On July 2, 2012, Work Order No. 7/12/063 was submitted for all cells on C-Wing, however, the work is not identified as having been completed or otherwise performed (Doc. 254-4, p. 3-4).

On August 27, 2012, a work order was submitted regarding Cell No. N-07-24 for "[n]o hot water," which was not completed until September 17, 2012 (Doc. 254-4, p. 6-7).

Work orders submitted for Cell No. N2-6-43 and N2-6-49 submitted within ten minutes of the work order for Cell No. N2-07-24 to repair the hot water were completed on September 6, 2012 (*Id.*). On September 4, 2012, another work order was submitted for Cell No. N2-07-24 for "[n]o hot water," which was also marked as completed on September 17, 2012 (*Id.* at p. 10-11). On September 19, 2012, another work order was submitted for the lack of hot water in Cell No. N2-07-24 and completed on September 28, 2012 (*Id.* at p. 13-14 & 16-17).

There were no work orders completed for Cell Nos. N2-07-24, N2-07-48, or N2-01-11 during Plaintiff's placement in these cells (Doc. 254-4, p. 19-56). There were no work orders submitted and completed for Cell No. N2-C-01 between October 25, 2012 and January 24, 2013 during Plaintiff's placement in this cell (Doc. 254-4, p. 58-81). A work order was submitted for Cell No. N2-04-11 on December 17, 2012 for an electrician to "[r]eplace recpti" (*Id.* at p. 83-84). On December 17, 2012, a work order was submitted for Cell No. N2-07-05 to repair the toilet (*Id.* at p. 86-87).

On January 28, 2013, staff submitted a work order for six hours of work ultimately completed on May 10, 2013 which stated generally, "no hot water" without specifying a location (Doc. 254-4, p. 89-90).

On February 6, 2013, another work order was submitted for Cell No. N2-07-24 for "hot water button broke" which was not marked as having been completed until June 18, 2013 (Doc. 254-4, p. 92-93).

On April 12, 2013, a work order was submitted for Cell No. N2-04-11 for a hot water issue which was completed on April 26, 2013 (Doc. 254-4, p. 95-96).

On April 18, 2013 a work order was submitted for Cell No. N2-C-01 for a clogged sink which was marked as completed on April 16, 2013 (Doc. 254-4, p. 95-96).

On July 23, 2013, a work order was submitted for a locksmith regarding Cell No. N2-04-11 (Doc. 254-4, p. 98-99).

On September 10, 2013, a work order was submitted for Cell No. N2-C-06 for a clogged sink which was marked as completed on November 1, 2013 (Doc. 254-4, p. 101-02).

On December 4, 2013, another work order was submitted without a specified location for "no hot water" and marked as completed February 16, 2013 (Doc. 254-4, p. 104-05).

On December 5, 2013, three more work orders were submitted for "C-08 does not have hot water", "Furnace trips breakers", and "No hot water" (Doc. 254-4, p. 107-08).

On September 24, 2014, a work order was submitted to "install new pumps in basement" which is improperly identified as having been completed on September 16, 2014, before the work order was even submitted (Doc. 254-4, p. 110-11).

A work order was submitted for Cell No. N2-C-06 on October 1, 2014 for a plumber to fix the "sinks drain slowly" which was completed on October 3, 2014 (Doc. 254-4, p. 113-14).

Another work order was submitted on October 1, 2014 for "ABC Wing showers not staying warm" which is marked as having been completed on October 3, 2014 (Doc. 254-4, p. 116-17).

On December 9, 2014, a work order was submitted because the "hot water pump is not working" which was marked as completed the same day (Doc. 254-4, p. 119-20).

In addition, a work order was submitted with the description "heat pump" on January 7, 2015 and marked as completed on January 8, 2015 (Doc. 254-4, p. 122-23).

On February 6, 2015, work orders were submitted for both Cell No. N2-07-48 and Cell No. N2-07-24 for "cold water stuck on", both of which were marked as completed on February 11, 2015 (Doc. 254-4, p. 125-26).

On February 11, 2015, a work order was submitted stating "heat pumps don't work", yet was improperly marked as completed on February 3, 2015 before the work order was submitted (Doc. 254-4, p. 128-29).

On August 17, 2015, a work order was submitted for Cell No. N2-C-06 for a leaking sink and once again improperly marked as completed on July 21, 2015 (Doc. 254-4, p. 131-32).

Another work order was submitted on October 2, 2015 and marked as completed in 0.30 hours on October 8, 2015 for "a,b,c wing showers water is cold need adjusted" (Doc. 254-4, p. 134-35).

Defendant Butler testified that heat was an issue since the beginning of her time as warden in 2014:

> I do recall that we had an issue with the heat and actually in several cell houses. So, you know, it was something that required a large amount of money that I had to get involved in and sign the approval. And then we were able to get parts and get people in to fix the issue… I think the assistant warden let me know that there was a heating issue in the cell house. And you know, we discussed what actions maintenance could take, if any. And I think it was determined that the issue required extra parts and extra – expertise, I think, in fixing it. … It happened in pretty much all of [the cell houses] But since this is dealing with administrative detention, I recall it happening in that cell house.

(Doc. 254-1, p. 107).

She estimated that the average temperature in the North II cell house during the winter was "anywhere from 65 to 75" but when the heat was out "[i]t was colder than that … in the 50s" (Doc. 254-1, p. 112).

If an inmate complains about the lack of heat, "there should be a work order completed" (Doc. 254-1, p. 118) because a "work order has to be completed in order for there to be any action" (*Id.* at p. 111-12).

Defendant Harrington received complaints from inmates that their cells were either cold or hot, depending on the season, and he would have maintenance address the issue (Doc. 254-1, p. 84). Defendant Harrington admitted "he was aware of some issues relating to the heating in the North II Cell house and that corrective measures were taken" (*Id.* at p. 95, ¶ 6).

Defendant Butler testified, "It was very common during tours for the inmates to complain. If it was cold, they would complain it was cold. If it was hot, they would

complain its hot" (Doc. 254-1, p. 111). Defendant Butler further testified, "I remember them complaining that it was cold. And I think the hot water was not hot enough for them" (*Id.* at p. 107).

Defendant Phillips testified that the C Wing was cold for basically the whole winter because the system would work intermittently before going out again (Doc. 254-1, p. 185).

During Defendant Atchison's time as warden, he instituted a policy of taking the temperature in each cell house which was to be carried out by the officers and overseen by the same chain of command as with the cleaning supplies and showers (Doc. 254-1, p. 49). Defendant Atchison specifically required that the temperature be taken inside of an administrative detention cell in addition to the gallery due to the difference in temperature caused by the difference in air flow (*Id.*). Defendant Atchison further testified that the temperatures were to be recorded on the unit shift reports (*Id.*).

Defendant Butler testified about the origins of the temperature taking policy as follows:

> It originated before I became warden just because Menard is so old and the upper-level galleries get really hot with a stone, natural stone, prison, and it absorbs the heat. So it was a way to monitor so we could take preventative action if it got too hot.

(Doc. 254-1, p. 110).

"For the most part, it would have been taken in front of the cell in what we would have called the gallery. We would not go into the cell unless the cell was empty. We would take – you know, we could do it at that point, but we wouldn't take offenders out to take the temperature" (*Id.* at p. 111). "[T]he temperature was noted on shift report every day

on every shift" (*Id.* at p. 112).

Defendant Phillips testified that as the officer, he monitored the temperature in the B and C wing a couple times a day on all three shifts using a thermometer that was screwed into the wall on C Wing near the desk or storage area, and recorded the temperature in a log (Doc. 254-1, p. 184). Defendant Phillips testified that he went into Plaintiff's cell to look at a broken window and although he could not give an estimate of what he thought the temperature was in Plaintiff's cell, it was colder than in the hall, as were the other inmates' cells compared to the hallway where the officers took the temperature (*Id.* at p. 187).

Defendant Butler also noted the difference in temperature between the gallery and the cells due to the difference in air flow (Doc. 254-1, p. 111). However, she stated, "I don't think there was ever an issue [during the winter] unless the heat went out" (*Id.* at p. 112).

According to the unit shift reports, when the temperature was actually taken inside of a cell, it was approximately six to ten degrees cooler than the temperature recorded on the wing (Doc. 254-2, p. 120-22, 124, 131, 137, 141, 165, & 221).

Defendant Atchison testified he recalled in 2012 "the heater was out and there was actions or things in the works to get the part to replace the heater or that heater exchange or something of that device, of that type" (Doc. 254-1, p. 49).

Although the temperature-taking policy began during the warmer months, it carried on year-round, Defendant Butler testified, "There was a point where we lost heat in a couple of the cell houses. So we took temperatures then" (Doc. 254-1, p. 111). For

purposes of addressing issues with heat, Defendant Butler testified that "maintenance would fall under the assistant warden of operations" (*Id.* at p. 107).

Defendant Jones stated that "there may have been times when the heat requires repairs" (Doc. 254-1, p. 210).

On October 7, 2013, a work order was submitted without a specified location stating, "thermostat broke" and marked as completed on October 15, 2013 (Doc. 254-4, p. 137-38).

On February 10, 2014, Work Order No. 12/14/088 was submitted for Cell No. N2-C-06 under the category "Prev Maint" for three hours of work completed on February 18, 2014 with a description "N2 C-06 does not have heat" (*See* Doc. 254-4, p. 142-43).

No earlier work orders were submitted for this issue in Cell No. N2-C-06 (*See* Doc. 254-4, p. 19-56, 58-81, 145-174, & 176-214).

On December 18, 2014, Plaintiff reported to a mental health professional, Melissa Coffey that "he is depressed and 'cold as hell'", Coffey's notes further indicate she "checked with gallery officer about the heat temp was set at 72*F" (*See* Doc. 254-4, p. 216).

On December 23, 2014, the Cumulative Counseling Summary notes provide that Plaintiff "[i]nquired about grievance filed about heat in cell" (*See* Doc. 254-4, p. 218).

Although not included in the records provided by Menard, medical records from Stateville Correctional Center indicate that there is a handwritten grievance dated December 20, 2014, which notes that it was forwarded to the administration on the same day. The grievance states as follows:

> I talked to Misty about my cell # *N2-C-06 having no heat that the vents blow cold air.* That this problem has been ongoing since my placement in Administrative Detention. I suffered this problem when I was in Cell # one,

eight and now six of N2 C-wing. Because of the cold temperature my Joint's bones are starting to make it hurt. No sick call at this time is being requested.

(*See* Doc. 254-4, p. 220).

In the lower left corner of the handwritten complaint, there is a further note dated 12-31-14 which states "slip forwarded back to N2 sick call folder" (*Id.*).

On January 1, 2015, a work order was submitted with the description "furnace won't go above 65 degrees" without designating a location, but was marked as completed on January 8, 2015 (Doc. 254-4, p. 222-23). On January 7, 2015, another work order was submitted with the description "heat does not work correctly vent fans need turned off" without further specifying a location and was marked as completed on January 26, 2015 (*Id.*).

Defendant Butler testified that during her tenure as warden between 2014 and 2016 the heat was an ongoing problem: "it was ongoing. It seemed like every season brought a different challenge, you know, with heaters or -- yeah, with the heat" (Doc. 254-1, p. 111).

Defendant Harrington testified that broken windows at a correctional facility are a serious concern during the winter and summer months (Doc. 254-1, p. 86).

Defendant Butler testified, "I do recall there being an issue with the crank windows in administrative detention. I don't think I went in the cell to look at it, but I remember that the crank part of the window would not work on some of the cells." It would be both stuck open and/or not open at all, "[w]henever the crank part stopped working, if it was open, it was hard to get it shut. And if it was shut, then you couldn't get it open" (Doc. 254-1, p. 108).

Defendant Butler further testified about the state of windows during the winter after she first became warden:

> I don't think there was any, like, stuck wide open, because we could always have access to them from the outside to force them shut. But the seal, I think, it wouldn't completely seal shut. So I recall that we did give them tape. And we would go into the cell – not me. But maintenance would go in and tape up so it wouldn't be drafty … I think it was, like masking tape or duct tape and plastic is what they used, I believe. I remember seeing it whenever I was doing tours … I don't know if it was plastic bags or plastic sheeting up. I don't know what kind of plastic it was.

(Doc. 254-1, p. 108).

Defendant Butler stated there would not be a work order for "taping over the windows. But actually fixing the windows, there would be a work order for that" (Doc. 254-1, p. 109).

Defendant Phillips testified that he recalls Plaintiff complaining that the window in his cell didn't work or was broken (Doc. 254-1, p. 185). When Defendant Phillips inspected the window, he discovered a draft due to the window not closing well enough such that cold air came though (*Id.* at p. 185-86). Defendant Phillips further testified that he put a work order in regarding the issue and that maintenance came to check all of the windows on the wing but that he did not recall if maintenance fixed Plaintiff's window (*Id.* at p. 186).

There is no record of a work order submitted for a broken window or windows in any of Plaintiff's cells (Doc. 254-4, p. 19-56, 58-81, 140-43, & 225-52).  There is no record of a work order submitted for a broken window or windows in the C-Wing (*Id.*).

Defendant Phillips testified that he received a call from the cell house major at which time he was told, "hey, there's a little bit of draft. To alleviate it, lets put trash bags – tape them up over the windows. That way there's another layer" (Doc. 254-1, p. 187).

Defendant Phillips further testified:

The next year, I know when we come into it, the inmates were already – before it even got cold, the inmates were asking if they could tape their windows shut. And Major Carter – this would have been his first year over there – and asked me, what are they talking about? I said last year during the draft – or because of the draft, Westfall had them put the -- … plastic bags and tape up over their windows. So he said, if that's what they did last year while we had this heating issue, let's do it again. Pass out extra blankets and such.

(*Id.* at p. 187-88).

Defendant Phillips further testified that he remembered passing out extra blankets in the C Wing for both winters including to Plaintiff (*Id.* at p. 188).

On December 28, 2012, the comments include "offender handed me a grievance", and on January 3, 2013, "handed me three grievances" (Doc. 254-1, p. 217).

On January 3, 2013, the comments further provide:

#1. grievance that the offender handed me on 12/28/12 requires an extension on property grievance concerning issues from 10/8/2012. Response-offenders have 60 days after an occurrence to file a grievance. If offender does not receive an answer, he may re-submit another grievance. It is the offenders responsibility to keep track of the time frame of his grievances. #2. Grievance dated as received on 1/3/13 by this counselor, complains he needs an asthma inhaler & to see doc. He wants the counselor to schedule a medical appointment. Response-HCU has been notified of offenders request to be seen. #3. Grievance dated as rec'd on 1/3/13, claims that an officer told him not to preseal his legal mail. Response-if an officer gives you a direct order &. You don't do it, you will get a ticket for disobeying a direct order. On the back of the orientation manual it states the information contained within is subject to change. Remember you will always be held responsible for your behavior. If you are unsure, ask. #4. Grievance dated rec'd on 1/3/13, claims issues from July 25, 2012. Response

not filed within the appropriate time frame.

(*Id.*).

On January 4, 2013, the cumulative counseling summary provides the following:

Returned emergency grievance E84-CAO deemed not an emergency. Grv dated 12-21-12 received by GO 12-26-12 states that on 12-19-12 inmate was denied a refill on his asthma inhaler. Response from HCU stated that patient's asthma is currently well controlled and was discontinued on 10/24/12 for that reason. Will be followed up on in the next asthma clinic.

(*Id.*).

According to medical records dated March 5, 2013, when Plaintiff was seen on the annex, he suffered from an asthma attack in December 2012 that was witnessed by healthcare staff who escorted him to HCU for evaluation (*See* Doc. 254-5, p. 3).

Plaintiff's medical records pertaining to visits to evaluate his asthma on June 11, 2013 and October 24, 2013 prior to his extended placement in administrative detention indicate that the severity of his asthma was previously classified as intermittent requiring inhaler use 1-2 times per day with no limitations interfering with normal activities. (*See* Doc. 254-5, p. 5-7).

On August 27, 2013, Plaintiff reported to medical professionals that he "sent in [his] refill sticker a week ago and never got [his] new inhaler" (*See* Doc. 254-5, p. 9). The medical records further indicate that the last inhaler was issued on June 13, 2013 and that Plaintiff self-reported his inhaler use had increased due to the increased heat and his cell status (*Id.*).

The Stateville medical record production includes a document titled "Offender Medical Problem List" that notes the gap in Plaintiff's chart from October 24, 2013 to March 11, 2014 (Doc. 254-5, p. 11-13).

On January 3, 2014, medical records indicate that Plaintiff requested a refill of his inhaler but his prescription would not be available until January 20, 2014 and that staff explained to him that he was "over-using his Xopenox inhaler" according to his prescription (Doc. 254-5, p. 15). Plaintiff reportedly responded that he understood but stated that he needs to use it "more often than they say to" (*Id.*).

Both the medical charts for January and February indicate that Plaintiff's prescription inhaler was last issued on October 18, 2013 (Doc. 254-5, p. 17-27).

Plaintiff was also scheduled for a follow-up consult at that time to occur on January 17, 2014 and January 27, 2014, which did not occur at either of the scheduled times for unrelated reasons involving security events (Doc. 254-5, p. 9).

On February 6, 2014, medical records report that Plaintiff suffered an asthma attack with staff "needing to rescue" due to "shallow breathe" and "occ cough" (Doc. 254-5, p. 48).

At his next visit on March 11, 2014, the records indicate that the severity of Plaintiff's asthma worsened to the classification of "persistent moderate" requiring daily inhaler use for daily symptoms resulting in minor limitations interfering with his normal activities (Doc. 254-5, p. 29).

Records show that Plaintiff was then issued his inhaler on March 11, 2014 (Doc. 254-5, p. 31). In addition, staff noted "open wounds or lesions" under his appearance in the medical record (Doc. 254-5, p. 33). He further reported weight loss with an explanation "in seg" during this appointment (Doc. 254-5, p. 35).

On April 25, 2014, Plaintiff reported to Franklin that he "feel[s] stressed from being in this cell" (Doc. 254-5, p. 37).

Plaintiff was next issued his prescription inhaler on April 29, 2014, after it was restocked on April 27, 2014 (Doc. 254-5, p. 39-40).

On May 6, 2014, Plaintiff reported to Franklin that he was "feeling angry, frustrated and stressed due to living on the Annex at Menard", while mental health records further note that he "made it very clear he did nothing wrong and he is being punished for not agreeing to be a prison informant" (Doc. 254-5, p. 42).

Plaintiff was seen again by Franklin for his anxiety on May 23, 2014 with no further notes provided and with no further action taken (Doc. 254-5, p. 44).

On June 6, 2014, Plaintiff reported to Coffey that he was anxious and frustrated that he was put in administrative detention for no reason and that "IA is trying to retaliate because of the grievances that he has sent [and] [h]e can't communicate with his family" (Doc. 254-5, p. 46).

At his next medical assessment on June 28, 2014, Plaintiff was prescribed coal tar shampoo to apply 3 times a week to affected spots as well as selenium sulfide to apply daily for one week and then weekly for six weeks (Doc. 254-5, p. 48).

Coal tar shampoo is commonly used to treat scalp conditions including dandruff, psoriasis and seborrheic dermatitis. Selenium Sulfide is generally prescribed as an anti-infective agent to relieve itching and flaking of the scalp and/or to treat tinea versicolor, a fungal infection of the skin. However, the records do not indicate what these were

provided for nor is there any further mention of the previously reported "open wounds or lesions" in the medical records provided by Menard (Doc. 254-5, p. 50-261).

On December 26, 2014, Plaintiff told Coffey he was still depressed, couldn't sleep, and had no appetite (Doc. 254-5, p. 216). At his next session with Coffey on January 2, 2015, Plaintiff stated, "I ain't doing alright" and reported "he is cold in the cell, depressed, is not sleeping, low appetite" (Doc. 254-5, p. 263-95). Coffey's notes further report that when she advised he would be referred to a new mental health professional, he "seemed resistant" and then said "I'm straight" and stated that he does not want to be seen by mental health. *Id.* Thereafter, Plaintiff refused to be seen by mental health services until his discussion with Creason on November 20, 2015 regarding his release from administrative detention. *Id.*

On or around October 16, 2015, Plaintiff was released from administrative detention (Doc. 254-1, p. 12, ¶ 62) (Doc. 254-1, p. 31, ¶ 62).  In January 2016, Plaintiff was transferred to Stateville Correctional Center. (Doc. 254-1, p. 12, ¶63) (Doc. 254-1, p. 31, ¶63).

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir.

2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

## ANALYSIS

The Constitution does not mandate comfortable prisons, but it mandates humane ones. *Thomas v. Blackard*, 2 F.4th 716, 729 (7th Cir. 2021) (internal citations and quotations omitted). "By prohibiting cruel and unusual punishment, the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care." *Id.* Prison officials who fail to uphold these duties violate the Eighth Amendment "upon exhibiting deliberate indifference to a substantial risk of serious harm to an inmate." *Id.*

Deliberate indifference includes "both an objective and subjective component." *Id.* An inmate who challenges his conditions of confinement "must first show that the conditions were sufficiently serious as an objective matter, meaning that they denied the inmate the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety." *Id.* (internal alterations omitted). "Second, in covering the subjective component of the inquiry, the inmate must prove that prison officials acted

with deliberate indifference—that they knew of and disregarded this excessive risk of harm to the inmate." *Id.* When considering an Eighth Amendment claim that challenges conditions of confinement, courts must examine the totality of the conditions. *Rhodes v. Chapman*, 452 U.S. 337, 363 (1981) (Brennan, J., concurring).

## I.   Objective Inquiry

To succeed on summary judgment, a plaintiff must establish that as a matter of law, his living conditions were so objectively serious that he was denied necessities and subjected to an excessive risk to his health or safety. Here, Plaintiff alleges his cell had no heat or hot water, was unsanitary, and was infested with rodents, which exacerbated his asthma condition.

To determine whether cold temperatures and unsanitary conditions constitute inhumane living conditions, courts must consider "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997). The question of whether living conditions violate the Eighth Amendment "will often be peculiarly appropriate for resolution by the trier of facts." *Id.* at 643.

The Court has reviewed all of the legible unit shifts reports from October 25, 2012 through December 31, 2014, which recorded the temperatures in the North II Annex where Plaintiff was housed (Doc. 254-2) (Doc. 254-3). On most days, the wing of North II was 70 degrees or above (*See Id.*). On approximately 11 days over the two years, the wing was 69 degrees (Doc. 254-2, p. 56, 103, 535, 536, 543, 554, 555, 570, 575) (Doc. 254-3, p. 17,

657). On approximately 14 days, the wing was 68 degrees (Doc. 254-2, p. 111, 149-50, 180, 238, 239-40, 258, 264, 529, 542, 585, 601, 602) (Doc. 254-3, p. 625-26 & 258-59). On one day, the wing was 67 degrees (Doc. 254-3, p. 58). Some of the unit shift reports recorded the temperature in the cells, as well as the wing (*See e.g.,* Doc. 254-2, p. 122). While some of the cells were the same temperature as the wing, some of the cells were ten degrees colder (*See e.g.,* Doc. 254-2, p. 221). Additionally, Defendant Butler testified the average temperature in Plaintiff's cell house in winter was between 65 and 75 degrees, but when the heat was out, the temperatures were in the 50s (Doc. 25401, p. 112). Also, there is evidence that Plaintiff's window was broken (Doc. 254-1, p. 108) (*See* Doc. 254-1, p. 185), but Defendant Phillips stated he gave Plaintiff extra blankets when he complained of cold temperatures (Doc. 254-1, p. 187-88). Defendant Butler stated maintenance personnel taped windows shut and plastic sheeting was placed on windows to prevent drafts (Doc. 254-1, p. 108). Also, work orders indicate the heat and hot water in Plaintiff's cell required servicing throughout the relevant times. Some work orders were completed the same day (Doc. 254-4, p. 119-20), some were completed within a number of days (*Id.* at p. 125-26, 116-17, & 122-23), and some were not completed for months (*Id.* at p. 89-90 & 104-05).

In addition to the cold, Plaintiff contends his cell was infested with rodents and he did not receive cleaning supplies. The Seventh Circuit has recognized Eighth Amendment violations where prisoners are deprived of cleaning supplies and faced with unsanitary conditions but "only in extreme circumstances" *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016); *see Vinning-El v. Long*, 482 F.3d 923, 923-24 (7th Cir. 2007) (reversing summary judgment in favor of the facility where an inmate was placed in a cell with

blood and feces without sanitation supplies). Further, "a significant" rodent infestation "may be considered" a constitutional deprivation, depending on the length, nature, and effects of the infestation. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (finding no Eighth Amendment violation as a matter of law where the plaintiff alleged that during his six years of confinement he saw several cockroaches and was bitten twice but an exterminator regularly visited his cell); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (reversing dismissal of an Eighth Amendment claim where the plaintiff alleged cockroaches and mice were "everywhere," "crawling on his body," "constantly awaken[ing] him," and causing him physical harm). In addition to the length and frequency of the rodent infestation, Courts should also consider whether the rodents came in contact with an inmate, whether the rodent bit the inmate, and whether the inmate suffered physical or psychological harm as a result of the rodent. *See Smith v. Dart*, 803, F.3d 304, 312 (7th Cir. 2015).

Here, Plaintiff filed several grievances that rodents ran "in and out of" his cell "every night" for months and "at any given time" and he was not provided any cleaning supplies (Doc. 254-1, p. 235-36) (Doc. 254-5, p. 307-08). However, Defendants testified that a sanitation officer passed out cleaning supplies, such as mops and disinfectant, on a weekly basis (Doc. 254-1, p. 105) (Doc. 254-1, p. 183). Grievance responses similarly state that cleaning supplies were offered to Plaintiff on a weekly basis, exterminators were addressing the rodent issues, and preventative measures were taken to prevent the presence of rodents (Doc. 254-1, p. 217 & 231).

When viewing the record in the light most favorable to Defendants, the Court cannot find that the conditions in Plaintiff's cell were unconstitutional as a matter of law. The resolution of the issue is fact intensive and cannot be determined from the record currently before the Court. Questions exist about the severity of the temperature in Plaintiff's cell, the duration of the cold temperatures and lack of hot water, whether Plaintiff had alternative ways to stay warm, the extent and nature of the rodent infestation in Plaintiff's cell, and whether Plaintiff received cleaning supplies every week. Accordingly, Plaintiff's motion for summary judgment is denied. But even if Plaintiff's living conditions were unconstitutional, Plaintiff has not established the subjective component of the deliberate indifference analysis.

## II. Subjective Inquiry

To be held liable under § 1983, a prison official must have been personally involved in causing the constitutional deprivation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). However, "a defendant's direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). "An official satisfies the personal responsibility requirement of § 1983 if she acts or *fails to act* with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Id.* (emphasis in original) (internal citations and quotations omitted).

"Deliberate indifference entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (internal citations, quotations, and alterations omitted). "The official

must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Here, Plaintiff brings Eighth Amendment claims against nine defendants and argues that "Defendants" as a whole were deliberately indifferent. However, § 1983 liability requires Defendants' personal involvement, such that Plaintiff must tie particular Defendants to particular conduct and injuries. *See Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (finding that "[v]ague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct" is insufficient on summary judgment). Plaintiff fails to do so in his summary judgment motion.

For instance, Plaintiff argues he "repeatedly complained to Defendants regarding the conditions of his confinement" (Doc. 253, p. 8). Plaintiff cites to grievances and grievance responses (*Id.*) (citing statements of fact ("SOF") numbers 49-52 and 124-26). He also points out that Defendant Harrington reviewed emergency grievances, supervised assistant wardens, and toured facilities and that Defendant Butler reviewed large expenditures and toured cellhouses (Doc. 265, p. 4). However, Plaintiff has not adduced sufficient evidence that Defendants ***actually*** reviewed or responded to the grievances. *See McDowell v. Pfister*, 2017 WL 359199, at *2-3 (N.D. Ill. Jan. 23, 2017) (and cases cited therein) ("Mere receipt of grievances from a prisoner is insufficient to establish that a prison warden was personally involved"); *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (explaining that while grievances and correspondences can provide evidence that correctional personnel were aware of constitutionally deficient conditions, a plaintiff

must demonstrate that the communications, in their content and manner of transmission, gave the prison officials sufficient notice to alert him or her to an excessive risk of his health or safety). Further, Plaintiff does not cite any evidence or argue that Defendants Harrington or Butler were aware of Plaintiff's specific complaints while touring the facility. *See Daughtery v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) ("[A]lthough [the defendants] may have made rounds through the prison and talked to inmates about their complaints, there is no evidence that either of them was specifically aware of the particular conditions forming the basis of [the plaintiff's] Eighth Amendment claim."). Further, as described in the preceding section, triable questions exist as to the condition of Plaintiff's cell, so the Court cannot determine as a matter of law that the conditions were so subhuman that Defendants would have noticed them by touring the facility. *See Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). Additionally, Plaintiff's arguments that Defendants are liable because of the "chain of command" amongst prison officials is a complete nonstarter—a supervisory official cannot be held vicariously liable under Section 1983 for the actions of his or her subordinates. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Also, Plaintiff cites to evidence that he reported the lack of heat in his cell to Melissa Coffee but she is not a Defendant in this action (Doc. 253, p. 8) (citing SOF numbers 124 and 170). Further, Plaintiff cites to evidence that he complained to Defendant Phillips about a broken window in his cell, Defendant Phillips inspected the window and put in a work order for maintenance to fix the window, and that maintenance checked the windows. (Doc. 253, p. 8) (citing SOF numbers 135-37). Also,

Defendant Phillips testified he gave Plaintiff extra blankets when he complained of cold temperatures (Doc. 25401, p. 187-88). A reasonable jury could find Defendant Phillips responded reasonably in the situation and was not deliberately indifferent. *See Daughtery*, 906 F.3d at 611 (finding no deliberate indifference where "standard procedure at Menard was for staff to refer any inmate complaints about the facility to the maintenance department" and the defendant "would routinely attempt to resolve maintenance issues by submitting work order or taking other remedial measures"); *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent."). Although there is evidence that a work order was not submitted, the Court views the record in the light most favorable to Defendants, as the non-movants, and cannot make credibility determinations or weigh the evidence on summary judgment. *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).

Next, Plaintiff argues the access to his medical prescription was restricted but there is no evidence Defendants were involved in his medical care or knew that Plaintiff was not receiving his medication (Doc. 253, p. 9). *See Williams v. Guzman*, 346 F. App'x 102, 105 (7th Cir. 2009) (finding that failing to review an inmate's medical records to determine an inmate's medical needs is not deliberately indifferent).

Finally, Plaintiff argues "Defendants did not issue a work order or document fixing" the broken window or lack of heat or hot water (Doc. 258, p. 9). He contends the

work orders and shift reports "show that the conditions complained of went unaddressed" (*Id.* at p. 8). He states there are no records that cleaning supplies were offered to him and that logbooks documenting the distribution of cleaning supplies were "returned to the assistant wardens of operations" (Doc. 265, p. 5). Again, Plaintiff makes no effort to specify who knew what facts, how those facts led each Defendant to infer a constitutional violation, or how each Defendant's action or inaction was deliberately indifferent. The case against each Defendant "must be examined individually, with particular focus on what the [defendant] knew and how he [or she] responded." *Dale v. Poston*, 548 F.3d 563, 570 (7th Cir. 2008). Conclusory statements that the conditions in Plaintiff's cell went unaddressed are insufficient to demonstrate Defendants were deliberately indifferent as a matter of law. *See Daugherty*, 906 F.3d at 611 ("[C]onclusory assertions that the defendants 'did nothing' cannot create a genuine issue of material fact, particularly without any evidence about what either defendant may have done or not done.").

Ultimately, the Court is not required to scour the record to piece together appropriate arguments for a party. *Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013). Plaintiff's reiteration of Defendants' job duties and his general arguments that conditions in his cell were not remedied do not establish, as a matter of law, that each Defendants was aware of Plaintiff's living conditions and acted inappropriately. Plaintiff has not met his burden of establishing he is entitled to summary judgment.

<u>C</u>ONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed by Plaintiff

Benard McKinley (Doc. 252) is **DENIED.**

**IT IS SO ORDERED.**

**DATED: May 26, 2022**

<u>/s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**